# SUPREME COURT,
## STATE OF KANSAS.

## JANUARY TERM, 1890.

PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, } Associate Justices.
Hon. WILLIAM A. JOHNSTON, }

The Atchison, Topeka & Santa Fé Railroad Company v. J. W. Morgan.

43   1
56  762
43   1
63  757

1. Engine, *Rapidly Backing — No Signal Given — Bodily Injuries — Negligence, Question for Jury.* If a person with a team and wagon crossing a railroad upon the highway of a village is injured by an engine, running rapidly backward at the rate of thirty miles an hour without any whistle being sounded, bell rung, or any other signal given, and such person has timely looked both ways, up and down the track, to ascertain whether there is any danger in crossing, and fails to discover the engine approaching, and there are complicated circumstances, as falling snow, a gale of wind, and other things calculated to deceive or throw him off his guard; *held,* whether he is guilty of negligence in attempting to cross the track, under the particular circumstances of the case, is a question of fact for the jury.

2. Special Findings, *Control Verdict.* When the special findings of fact are inconsistent with the general verdict, the former control.

*Error from Harvey District Court.*

On March 3, 1886, John W. Morgan brought his action, against the *Atchison, Topeka & Santa Fé Railroad Company* to recover $8,000 for damages, alleged to have been received

on the 7th day of December, 1885, by him, on account of the negligence of the company.  On March 26, 1886, the railroad company filed its answer, which was a general denial of the allegations of the petition.  Trial had at the September term of the district court for 1887, before the court with a jury. The jury returned a verdict for plaintiff, and assessed his damages at $4,227.  The jury also found and returned the following special findings of fact:

"1.  At the time of plaintiff's injury, was it not 600 feet from the crossing where he was injured to a point opposite the door entering the front of the depot at Walton ?   A.  Yes.

"2.  At what rate of speed was the engine which struck plaintiff's team traveling per hour when it struck the team ? A.  30 miles.

"3.  About how far from the crossing where plaintiff was injured was it to a point on the railroad track, opposite of the tool-house west of the depot ?   A.  2,000 feet.

"4.  When plaintiff, just prior to his injury, reached a point 70 feet north of the railroad track on the crossing, where he was injured, could he see at that time along the railroad track from the crossing west to about the depot ?   A.  No.

"5.  If the jury answer the last question in the negative, they may say how far plaintiff could at that point see the railroad track from the crossing toward the depot.   A.  Do not know.

"6.  If the jury answer question No. 4 in the negative, they may state what, if anything, prevented the plaintiff from seeing from the point mentioned in that question, the railroad track from the crossing to about the depot.   State fully.   A. Storm.

"7.  Immediately prior to plaintiff's injury, at what rate of speed per hour in miles, was plaintiff driving his team from the time he reached a point 70 feet north of the crossing to the point where the engine struck his team ?   A.  Three and one-half miles.

"8.  When plaintiff reached a point 60 feet north of the crossing, just prior to his injury, could he from that point, at that time, see the railroad track from the crossing up to about the depot ?   A.  No.

"9.  If the jury answer the last question in the negative, they may state what, if anything, could have prevented the plaintiff at that time from seeing from that point, the railroad

track from the crossing to about the depot. State fully. A. Storm.

"10. If the jury answer the eighth question in the negative, they may state how far plaintiff could have seen the railroad track toward the depot, from the crossing, when he was 60 feet from the crossing. A. Do not know.

"11. Just prior to plaintiff's injury, and when he had reached a point 50 feet north of the crossing, could he not have seen the railroad track from the crossing to about the depot? A. No.

"12. If the jury answer the last question in the negative, they may state about how far plaintiff at that time, and from such point, could have seen along the railroad track from the crossing toward the depot. A. Do not know.

"13. If the jury answer the 11th question in the negative, they may state what, if anything, would have prevented plaintiff at that time, and from that point, from seeing along the railroad track to about the depot. State fully. A. Storm.

"14. Just prior to plaintiff's injury, when he had reached a point 40 feet north of the crossing, could he have seen along the railroad track from the crossing to about the depot? A. No.

"15. If the jury answer the last question in the negative, they may state what would have prevented the plaintiff at that time, and from that point, from seeing along the railroad track from the crossing to about the depot. State fully. A. Storm.

"16. If the jury answer question No. 14 in the negative, they may state about how far plaintiff at that time, and from that point, could see along the railroad track, from the crossing toward the depot. A. Don't know.

"17. How far from the crossing where plaintiff was injured, was it to the clearance-post which was immediately west of the crossing, between the north side-track and the main track? A. 205 feet.

"18. Just prior to plaintiff's injury, and when he reached a point 30 feet north of the crossing, could he see along the railroad track, from the crossing to the depot? A. No.

"19. If the jury answer the last question in the negative, they may state what would have prevented the plaintiff at that time, and from that point, from seeing along the railroad track, from the crossing to the depot. State fully. A. Storm.

"20. If the jury answer question No. 18 in the negative, they may state about how far plaintiff, at that time, and from

that point, could see along the railroad track, from the crossing toward the depot. A. Don't know.

"21. Just prior to plaintiff's injury, and when he had reached a point 20 feet north of the crossing, could he see from that point along the railroad track, from the crossing to the depot? A. No.

"22. If the jury answer the last question in the negative, they may state what would have prevented the plaintiff at that time, and from that point, from seeing along the railroad track, from the crossing to the depot. State fully. A. Storm.

"23. If the jury answer question No. 21 in the negative, they may state how far plaintiff could have seen along the railroad track, from the crossing toward the depot, from that point. A. Don't know.

"24. Is it not a fact that while plaintiff was traveling from a point 70 feet north of the crossing to the crossing, that his wagon made some noise? A. Yes.

"25. Just prior to plaintiff's injury, how many seconds did it take to go from a point 70 feet north of the crossing to the point where his horses were struck, at the gait at which he traveled that distance? A. About 14 seconds.

"26. With the engine traveling at the rate it was going when it struck the plaintiff, how far would it have been from the crossing at the time plaintiff was 70 feet from such crossing, to have reached this crossing at the same time plaintiff reached it? A. About 616 feet.

"27. Is it not a fact that at the time of and prior to plaintiff's injury, he was familiar with the railroad crossing where he was injured? A. Yes.

"28. Is it not a fact that during the time plaintiff was familiar with this railroad crossing, prior to his injury, he knew that engines and cars were liable to pass over it at any time, and that a person about to cross the same would have to watch and listen carefully for the approach of trains? A. Yes.

"29. At the rate of speed, which you find the engine and the plaintiff were traveling respectively, how far from the crossing was the engine when plaintiff was 60 feet therefrom? A. About 528 feet.

"30. At the rate of speed, which you find the engine and the plaintiff were traveling respectively, how far from the crossing was the engine when plaintiff was 50 feet therefrom? A. About 440 feet.

"31. At the rate of speed at which you find the plaintiff

and the engine were traveling, respectively, how far from the crossing was the engine when the plaintiff was 40 feet therefrom? A. About 352 feet.

"32. At the rate of speed which you find the plaintiff and the engine were traveling, respectively, how far from the crossing was the engine when the plaintiff was 30 feet therefrom? A. About 264 feet.

"33. At the rate of speed which you find the plaintiff and the engine were traveling, respectively, how far from the crossing was the engine when the plaintiff was 20 feet therefrom? A. About 176 feet.

"34. At the rate of speed which you find the plaintiff and the engine were traveling, respectively, how far from the crossing was the engine when the plaintiff was 10 feet therefrom? A. About 88 feet.

"35. After plaintiff got around the meat shop to a point where on a clear day one could see from the crossing along to the railroad track to the depot, what, if anything, prevented plaintiff from seeing at that point along the track from the crossing to the depot? State fully. A. Nothing but the storm.

"36. How far was plaintiff from the crossing when he reached a point where a person on a clear day could see along the railroad track to the depot from the crossing? A. About 60 feet.

"37. How far was plaintiff from the crossing when he reached a point where a person on a clear day could see along the railroad track from the crossing to a point about opposite a tool-house at the west? A. About 45 feet.

"38. How far was plaintiff from the crossing when he reached a point from which a person on a clear day could look along the railroad track from the crossing to a point west, spoken of as the summit? A. About 40 feet.

"39. About how far from the crossing where plaintiff was injured was it to the point called the summit? A. About 3,960 feet.

"40. From the time plaintiff reached a point seventy-five feet north of the crossing to the time the engine struck his horses, did he look to the west for the purpose of ascertaining if any train was approaching from that direction? A. Yes.

"41. If the jury answer the last question in the affirmative, they may state how many times plaintiff looked in that direction between the two points mentioned. A. Three times.

"42. With nothing on the track at the time plaintiff was

injured to have obstructed the view, could a person have seen by looking from the crossing to the depot, notwithstanding the condition of the weather? A. No.

"43. The jury may state about how far plaintiff saw along the track from the crossing toward the depot, when he first looked. A. Do not know.

"44. If the jury find that plaintiff looked more than once to the west after he got within seventy-five feet from the crossing, they may state about how far to the west he saw along the railroad track from the crossing, the second time he looked. A. Do not know.

"45. If the jury find that plaintiff, after he got within seventy-five feet of the crossing, looked more than twice to the west, they may state about how far he saw from the crossing along the track west, the third time he looked. A. Do not know.

"46. If the jury answer the 40th question in the affirmative, they may state how far plaintiff was from the crossing when he first looked. A. About 45 or 50 feet.

"47. If the jury find that after plaintiff reached the point seventy-five feet from the crossing he looked to the west more than once, they may state about how far he was the second time he looked, from the crossing. A. About 25 or 30 feet.

"48. If the jury find that after plaintiff reached a point seventy-five feet north of the crossing, he looked to the west more than twice, they may state about how far from the crossing he was when he looked the third time. A. About 15 or 20 feet.

"49. At the time of injury were there any box cars standing on the north side of the track west of the crossing? A. No.

"50. If the jury answer the 49th question in the affirmative, they may state how many box cars there were at that time on that side-track. A. ———.

"51. If the jury answer the 49th question in the affirmative, they may state whether such cars were standing to the east or west of the clearance-post. A. ———.

"52. If the jury answer the 49th question in the affirmative, they may state how far such cars were standing from such clearance-post. A. ———.

"53. About how far was it from the crossing where plaintiff was injured, to a point on the railroad track directly opposite the coal-office scales? A. About 250 feet.

"54. About how far is it from the scales at the coal office

to the main track directly opposite such scales? A. About 72 feet.

"55. Immediately prior to plaintiff's injury, was the atmosphere in such a condition that a person in a wagon, standing on the scales at the coal office, could see distinctly the man on the engine which injured plaintiff, and see which way they were looking as the engine which injured the plaintiff passed the point opposite such scales? A. Yes.

"56. When the engine which injured plaintiff passed opposite the scales at the coal office, at what rate of speed was it going? A. Thirty miles an hour.

"57. Is it not a fact that the heads of plaintiff's horses were about 10 or 15 feet from the crossing when the engine that struck them was passing a point about opposite the scales at the coal office? A. Yes.

"58. If the jury answer the last question in the negative, they may state about how far the heads of plaintiff's horses were from the crossing when the engine which struck them was about opposite the scales at the coal office. A. ——.

"59. When the engine which struck plaintiff's team was about opposite the coal office, what, if anything, would have prevented plaintiff from seeing it at that time if he had looked? A. Storms.

"60. When the engine which injured the plaintiff was 180 feet west of the crossing, what, if anything, would have prevented plaintiff from seeing it at that point if he had looked? State fully. A. Nothing but the storm.

"61. When the engine which injured plaintiff was at a point 220 feet west of the crossing, what, if anything, would have prevented plaintiff from seeing it, if he had looked at that time? State fully. A. Nothing but the storm.

"62. When the engine which injured plaintiff was at a point 320 feet west of the crossing, what, if anything, would have prevented plaintiff from seeing it at that time, if he had looked? State fully. A. The storm.

"63. Which direction was the wind blowing at the time plaintiff was injured? A. From southwest.

"64. Was the wind blowing hard at the time of plaintiff's injury? A. Yes.

"65. Was the engine which injured plaintiff making sufficient noise to be heard 90 feet away and to the south of it, just prior to striking plaintiff's team? A. Do not think so.

"66. About how far from the crossing would the engine have been when the men upon it could first have seen the

plaintiff if they had kept a vigilant look-out in his direction, as the engine approached the crossing ? A. Do not know.

"67. About how far from the crossing was the engine when the men upon it first discovered plaintiff ? A. About 75 to 100 feet.

"68. Could the men in charge of the engine have stopped it so as to have prevented the accident after they had discovered plaintiff ? A. No; too late.

"69. What would have prevented plaintiff from seeing the engine at the point where the men on the engine could have first seen plaintiff, if they had looked, and if he had looked ? State fully. A. The storm direct in his face.

"70. How far from the track was plaintiff when the men on the engine first saw him ? A. About 10 feet.

"71. Is it not a fact that plaintiff, from the time that he was at a point 70 feet north of the crossing to the time he reached it, had his team under perfect control, and could have stopped them in an instant if he had desired ? A. Yes.

"72. Did plaintiff from the time he started from the store to cross the track, stop his team before it was struck ? A. He did not.

"73. If the plaintiff had stopped his team 20 feet north of the crossing to look and listen for the approach of cars, would he not have been able to have seen the engine in time to have avoided the accident ? A. We think he could.

"74. If the jury answer the last question in the negative, they may state what would have prevented plaintiff from seeing the engine in time to have avoided the accident, if he had so stopped. State fully. A. ——.

"75. If the jury find for the plaintiff, they may state how much damage, if any, they allow him for the services of the doctor. A. $25.

"76. How much was plaintiff able to earn a year prior to his accident ? A. $500.

"77. Is it not a fact that since the injury plaintiff has been able to do at least three-fourths as much work as he could do before the injury ? A. Except the first six months.

"78. If the jury find for the plaintiff, they may state how much they allow the plaintiff, in the amount found for him, for pain and suffering ? A. Nothing."

On September 26, 1887, the railroad company filed its motion for a new trial, containing all the statutory grounds. This motion was overruled, and judgment rendered in favor

of *Morgan* and against the company, upon the verdict of the jury. The *Company* excepted, and brings the case here.

*Geo. R. Peck, A. A. Hurd,* and *C. N. Sterry,* for plaintiff in error.

*J. W. Ady,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action brought by John W. Morgan against the railroad company to recover for personal injuries; also, for the killing of a pair of horses owned by him, and for damages to his wagon and harness. The material facts in the case are as follows: On the 7th day of December, 1885, about noon, Morgan, while attempting to cross the track of the railroad company at a public crossing with his team and farm wagon on Main street, in the village of Walton, a small place of two hundred and fifty inhabitants, in Harvey county, in this state, was struck by the rear end of the tender of a railroad engine, running backward through the village and over the crossing at a high rate of speed — thirty miles an hour: his wagon was making some noise. He was severely injured, his horses were killed, and his wagon and harness broken. He was thirty-seven years of age, a farmer by occupation, and had been familiar with the road and crossing for nearly four years. He attempted to cross the railroad track to reach a coal yard to obtain a load of coal. He approached the crossing from the west and north. The depot at Walton, a small, low building, was six hundred feet west of the crossing. A few feet from the crossing, in the direction from which the engine came, two side-tracks gradually diverged from the main track for some little distance, and then paralleled it. Along the south side of the track there were two or three buildings, the depot being between the main track and the side-track running south of it. At the time Morgan attempted to cross the track it was snowing very hard, and the wind was blowing a gale. When he approached the crossing he looked both ways several times, up and down the track, and did not

see any engine or cars. When he was within forty or fifty feet of the crossing there were no obstructions immediately upon the track, or on the north side of the track, to a view of the track for several hundred feet west, if the day had been clear.

It may be assumed from the evidence and findings of the jury that the whistle of the engine was not sounded, nor the bell rung, nor any other signal given by the employés operating the engine as it approached the crossing where the injuries occurred which are complained of. In many things the testimony of the witnesses is conflicting, but it was the province of the jury to determine the question of veracity between the witnesses, and therefore all matters supported by the testimony found in favor of the plaintiff by the verdict or special findings must be considered as having been proved. The negligence of the railroad company must be regarded under the testimony and verdict as having been established.

The most important question presented in the case is, whether Morgan is to be denied any damages for his injuries on account of his alleged contributory negligence. In other words, was it error for the district court to submit the question of his contributory negligence to the jury? Within the decisions of this court, we do not think we can say as a matter of law that contributory negligence was so clearly established upon the part of the defendant that he cannot recover; and therefore it was not error to refuse to withdraw from the jury the question of his contributory negligence. (*L. L. & G. Rld. Co. v. Rice*, 10 Kas. 426; *K. P. Rly. Co. v. Richardson*, 25 id. 391; *W. & W. Rld. Co. v. Davis*, 37 id. 743.)

*U. P. Rly. Co. v. Adams*, 33 Kas. 427, and *A. T. & S. F. Rld. Co. v. Townsend*, 39 id. 115, are cited against the recovery of any damages. These cases do not apply. In the former, the parties who were familiar with the highway and crossing drove up in a two-horse wagon upon a trot in plain view of the railroad track, without stopping to listen or look for the approach of a train, or take any precaution whatsoever to learn whether there was danger in attempting to cross. In

the latter case, the injured party did not look for the train after he reached the right-of-way of the railroad company, and the jury found that he ceased to look at the distance of seventy-five feet before he reached the track.  In this case the testimony shows that when Morgan approached the crossing he looked both ways, up and down the track, and the jury found that from the time he reached a point seventy-five feet north of the crossing to the time the engine struck his team, he looked west three times for the purpose of ascertaining whether any engine or train was approaching.  It is possible that Morgan was deceived by the appearances on account of the snow and wind.  This was more likely to occur as the engine was moving backward, not forward, and not ringing any bell or sounding any whistle, or giving any other signal. An engine and tender running swiftly would not make the noise or rumbling of a train of cars.

The counsel for the railroad company contend that the testimony that Morgan looked and saw nothing, should not be considered, because they say his statement raises no conflict of evidence.  Several cases are cited to support this contention.  One of these, *Artz v. Railroad Co.*, 34 Iowa, 153, is a case where the injured party testified that "he both looked and listened to see the train, but did not."  The testimony in that case clearly establishes that the train was approaching him in the night with the engineer's headlight burning brightly, and if he looked he must have seen it, or he must have looked very negligently or carelessly.  In another case, *Railroad Co. v. Elliott*, 28 Ohio St. 340, it was shown that if the party injured had looked, as a man exercising ordinary care should have looked, he could not have failed to see the train approaching.  The other cases referred to are similar, and decide that when the object a person seeks to discover is plainly and palpably visible before him, his evidence that he looked and did not see, amounts to nothing; then his testimony is not true, or his exercise of vision is such as to have been negligent or culpable.  This, in our view, is not such a case.  In this connection it should be noticed that there were three persons upon

the engine which was running so rapidly — the engineer, the fireman, and a watchman.   None of these noticed Morgan or his team until the collision, except the engineer, and he first saw Morgan when the engine was seventy-five or a hundred feet only from the crossing.   If Morgan could have seen the engine approaching for a long distance, as counsel for the railroad contend, then of course the persons operating the engine could as easily have seen him, or his team, the same distance. What was said in *Artz v. Railroad Co.*, supra, may well be repeated here:

> "If the view of the railroad, as the crossing is approached upon the highway, is obstructed by any means, so as to render it impossible or difficult to learn of the approach of a train,
>
> 1. Bodily in-
> juries—negli-
> gence, ques-
> tion for jury.
> or there are complicating circumstances calculated to deceive or throw a person off his guard, then, whether it was negligence on the part of the plaintiff or the person injured, under the particular circumstances of the case, is a question of fact for the jury."

Again, it is contended that the snow storm and gale of wind were temporary obstructions only; therefore that it was the duty of Morgan, when he reached the track, to wait until these obstructions passed away.   We cannot say upon the testimony as a matter of law, that these obstructions were temporary only; these are matters for the jury, and they were properly instructed to consider them. (*Solen v. V. & T. Rly. Co.*, 13 Nev. 106; *Shaber v. St. P. M. & M. Rly. Co.*, 28 Minn. 103; *Salter v. U. & B. R. Rly. Co.*, 59 N. Y. 631.)

In *McCrory v. Railroad Co.*, 31 Fed. Rep. 531, the temporary obstruction of vision was smoke — something that would pass away in a moment.   In *Railroad Co. v. Houston*, 95 U. S. 697, about all that was decided was —

> "That upon attempting to cross a railroad track, a person is bound to use his senses — to listen and to look — in order to avoid any possible accident from an approaching train.   If he omits to use them, and walks thoughtlessly upon the track, or if, using them, he sees the train coming, and instead of waiting for it to pass, undertakes to cross the track, and in either case receives any injury, he so far contributes to it as to deprive him of any right to complain."

Further, it is said as the jury found that if Morgan had stopped his team twenty feet north of the crossing to look and listen for the approach of a train, he could have seen the engine in time to avoid the accident, and as he did not stop, therefore that he is not entitled to any damages.    It was said by this court as long ago as 1872, that "the traveler on the highway is not bound to stop when he approaches a railroad." (*Railroad Co. v. Rice*, 10 Kas. 426.)

Most of the states support the rule recognized by this court. (2 Lacey, Rld. Dec. 764.)    Only a few of the states decide that the failure to stop before crossing a railroad track is negligence *per se.* (*Railroad Co. v. Beale*, 73 Pa. St. 504; 6 Am. Rep. 158; 2 Lacey, Rld. Dec. 765.)

The plaintiff is not precluded from recovery because on approaching the railroad crossing he did not stop.    Of course he must have exercised that degree of diligence in ascertaining the approach of the engine that a man of ordinary prudence would have exercised under like circumstances.    If he did this, notwithstanding the special findings of the jury he is entitled to his damages, if the railroad company through its agents or employés was guilty of culpable negligence.

Considering what has already been said, we do not think it necessary to comment at length upon the instructions given or refused.    The law was not stated incorrectly, nor any instruction material to the issues refused.    It was said in the opinion in *Improvement Co. v. Stead*, 95 U. S. 165:

"The mistake of the defendant's counsel consists in seeking to impose upon the wagon too exclusively the duty of avoiding collision, and to relieve the train too entirely from responsibility in the matter.    Railway companies cannot expect this immunity so long as their tracks cross the highways of the country upon the same level.    The people have the same right to travel on the ordinary highway as the railroad companies have to run trains on the railroad."

These remarks have special application in this case, because the engine had three employés to operate it, and to look out for obstructions.    Further, the engine was not drawing any

freight or passenger cars, and the parties operating it were relieved from all responsibility in looking after freight or passengers.

The complaint that the special findings of the jury conflict with the general verdict, is a substantial one. The verdict was for $4,227. Morgan testified that at the time of the collision he was farming seventy-five acres of land; that he was confined to his bed after that about·three weeks; that it was nearly six months before he could go to work again; that before he was injured he ordinarily made $500 a year. He also testified:

"Q. You may state as near as you can, how much less work you can do now, if any, than you could before you were hurt? A. One-quarter less.

"Q. What do you mean — that you can do three-fourths as much work now as you could before? A. Yes, sir."

The jury answered to particular questions submitted to them, that Morgan was able to earn $500 a year prior to his injury; that except the first six months after his injury he was able to do at least three-fourths as much work as he could do before the injury; that in the general verdict there was an allowance of $25 for the physician attending him, but that there was nothing given for pain or suffering. When the special findings of fact are inconsistent with the general verdict, the former control the latter. (Civil Code, § 287; *Railway Co. v. Lyon*, 24 Kas. 748.) As the general verdict did not include any compensation, or damages for pain and suffering, it is excessive — not being supported by the testimony. Why the jury refused to allow Morgan anything for the pain and suffering resulting from his injuries, we do not understand. However, the special findings control. The value of the horses killed was $400; the damages to the wagon and harness were $40; the physician's bill was $25; total amount $465. Morgan's yearly loss, excepting the first six months after his injury, was one-fourth of $500 — $125. For the first six months of his disability he is entitled to one-half of $500 — $250. $2,084 would pro-

2. Special findings, control verdict.

duce annually at 6 per cent. interest, (the present legal rates,) $125; therefore, all damages included in the general verdict above $2,799 cannot be sustained.

The judgment must be reversed unless Morgan, within thirty days, remits $1,428.    If this is done, the judgment will be affirmed for $2,799, the plaintiff below paying the costs.

The *U. P. Rly. Co. v. Dunden*, 37 Kas. 1–8, referred to, furnishes no support to the general verdict.    In that case there were no special findings of the jury conflicting with the verdict, or stating what specific damages were allowed or disallowed.

The case will be remanded, and, if $1,428 is remitted, judgment will be entered accordingly; otherwise a reversal must be had.

All the Justices concurring.